UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT FILED

| | |
|---|---|
| PAUL CAYER | : CASE NO. 3:02CV1130(HBF) |
| V. | : U.S. DISTRICT COURT |
| | : BRIDGEPORT, CONN. |
| JAMES ROACH and | : |
| CHARLES SPIRIDON | : NOVEMBER 12, 2005 |

**PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION TO VACATE
DISPOSITIVE MOTION DEADLINE AND TO SET NEW SCHEDULING ORDER**

As the Plaintiff, I object to defendants' latest ploy to cause yet another delay in the adjudication of my case. This case was originally scheduled to go to trial over TWO YEARS AGO.

Judge Fitzsimmons' Order and Ruling of August 17, 2005 is clear and unambiguous. The deadline for filing of the dispositive motion was 60 days from the date of the August 17th order. It was not 60 days from any ruling an the disclosure of medical records. Consequently, the 45-day extension that has been granted to the defendants means what it says. And it says December 2, 2005. AAG Jordano notes that Judge Fitzsimmons has not issued an order regarding the disclosure of medical records. PLAINTIFF notes that on June 23, 2005 oral argument in Court, Judge Fitzsimmons stated on the record, in response to my question, that she had already conducted an in camera review of the records and found nothing that was relevant. If any party denies this, then please consider this a request fo a copy of the transcript of that proceeding.

Regarding AAG Jordano's request that the proceedings be delayed pending a decision in the Garceti case, Plaintiff states that there is already a decision in this matter and it is the Ninth Circuit's decision. I'm sorry if Mr. Jordano didn't like it. He would like to wait for a new decision, hoping it will be one that he ikes. This does not constitute adequate cause for further delay. I have stated repeatedly that continued delay harms me as the Plaintiff, in that witnesses and defendants move away, memories fade, and testimony becomes less and less reliable.

Plaintiff would also like to inform the Court that the present case differs from the Garcetti case in at least one very important element. That element is the issue of discretionary speech versus speech directly related to a person's employment responsibilities. The attached documents, including testimony by management officials at deposition, show that the University had a written policy prohibiting adverse actions against individuals who oppose discriminatory practices and who otherwise assist others in their discrimination complaints, including offering to testify. The testimony of these two management officials CONFIRMS that I, the Director of Human Resources at the University, was covered under these policies. The speech referred to in these policies is DISCRETIONARY speech in that it does not relate to any job responsibilities the employee might have in the matter. In

the Garceti case, there obviously was no such written policy governing search warrants. Consequently, a Supreme Court decision covering mandated speech, or speech directly related to an employee's job responsibilities, will not necessarily have impact upon my case.

WHEREFORE, the Plaintiff respectfully requests that the Court DENY the defendants' motion to cause continued delay in my case.

PLAINTIFF,

*/s/ Paul N. Cayer*

PAUL N. CAYER, pro se
173 Old Burville Rd.
Torrington, CT 06790
tel: 860-626-0340

## CERTIFICATION

I hereby certify that a copy of the foregoing was mailed on November 12, 2005 to:

Joseph Jordano
Assistant Attorney General
55 Elm St.
PO Box 120
Hartford, CT 06141-0120

*/s/ Paul N. Cayer*
Paul N. Cayer



## Affirmative Action Grievance Procedure

The Affirmative Action Regulations by State Government require that Western Connecticut State University establish a system to process and resolve employee allegations of discrimination consistent with Chapters 67 and 68 of the Connecticut General Statutes. This requirement further stipulates that this system provide for the expeditious resolution of grievances, to assure that legal options for filing complaints with enforcement agencies are not foreclosed. The parameters for what this grievance procedure should include are also set forth in the Regulations and are incorporated into the University's discrimination grievance procedure. The University's discrimination grievance procedure has been approved by the Commission as meeting compliance with the Regulations.

All records relevant to employee grievances filed under Section 46a-68-46 of the Affirmative Action Regulations by State Government shall be maintained by the University for examination by the Commission. All records of grievances and dispositions thereof, shall be maintained and reviewed on a regular basis by the Executive Assistant to the President for Multicultural Affairs to detect any patterns in the nature of the grievances. In accordance with the Regulations, records so retained shall be confidential except where disclosure is required by law. The complainant and the respondent shall have access to all relevant documents to the extent required by law. Access shall include, but not be limited to, all documents presented or considered by the panel, should a panel be convened.

PROTECTION FROM ADVERSE ACTIONS - All employees shall be free from all restraint, interference, coercion, or reprisal on the part of their associates, supervisors and all others in making any complaint or appeal, in serving as a representative for a complaint, in appearing as a witness, or in seeking information. The above principles apply with equal force after a complaint has been adjudicated. Should these principles be violated, the facts shall be brought to the attention of the Executive Assistant to the President for Multicultural Affairs by the aggrieved party, his/her representative, or any person affected. The Executive Assistant to the President for Multicultural Affairs shall bring all such situations to the attention of the President and Dean of Human Resources for confidential discussion, review, the potential for early proactive intervention and appropriate action.

FILING A COMPLAINT - A complaint may be filed by any employee, applicant, student, or other person who believes that an employment/service practice at Western Connecticut State University has or will result in discrimination against him/her. A complaint of general discriminatory employment may also be filed. The complainant and respondent shall have the right to representation and shall be afforded due process. All complaints received are initially assessed for 90-day filing timeliness and jurisdiction of the Affirmative Action Office to initiate an investigation of discrimination.

The Executive Assistant to the President for Multicultural Affairs may be contacted for confidential counseling regarding a particular matter, will provide confidential counseling as requested and necessary during the complaint process, and ensure prompt consideration of complaints filed.

All complaints are to be filed with the University Executive Assistant to the President for Multicultural Affairs by writing to: Barbara Barnwell, Executive Assistant to the President for Multicultural Affairs, Western Connecticut State University, Old Main - Office 101, 181 White Street, Danbury, CT 06810. Initial contact may also be made by calling (203) 837-8277 or TTY(203) 837-8284

Any person not able to file a complaint in the above manner, may use whatever method that is accommodating to him/her.

Individuals are advised of their legal options to file complaints with the Connecticut Commission on Human Rights and Opportunities, United States Equal Employment Opportunity Commission, United States Department of Labor, Wage and Hour Division and any other agencies, state, federal or local that enforce laws concerning discrimination in employment.

All complaints received that may subject an employee to disciplinary action must be reported to the Dean of Human Resources by the Executive Assistant to the President for Multicultural Affairs and jointly investigated, incorporating University personnel procedures into the investigation process. Any contested disciplinary action shall be pursued through the appropriate contract article or other external means of choice.

The Executive Assistant to the President for Multicultural Affairs shall personally investigate and/or oversee all discrimination complaints filed with the University. The Executive Assistant to the President for Multicultural Affairs is charged to notify the accused party of the particulars of a complaint within five working days from the time the complaint is received. Also, the complainant and the respondent, to the extent required by law, shall be notified of the outcome of the complaint.

The Executive Assistant to the President for Multicultural Affairs is designated to resolve complaints through an informal mediation or investigatory process. Mediation should take place at the supervisory or department head level under the guidance of and with concurrence from the Executive Assistant to the President for Multicultural Affairs. However, investigations will take place where such mediation between the parties has failed, where either party requests, or as the Executive Assistant to the President for Multicultural Affairs deems appropriate. The Executive Assistant to the President for Multicultural Affairs shall have full access to University records, resources, and staff in the mediation, investigation, and resolution of complaints.

If, after investigation of a complaint, the Executive Assistant to the President for Multicultural Affairs has reasonable cause to believe that an act of discrimination may have taken place, or has the potential to take place, such findings shall be brought to the attention of the President and Dean of Human Resources for review and corrective action, as appropriate. The Executive Assistant to the President for Multicultural Affairs is charged, in this regard, to conciliate and/or bring closure to the matter in a manner that eliminates the discriminatory act in question.

If, after investigation of a complaint, the Executive Assistant to the President for Multicultural Affairs does not have reasonable cause to believe an act of discrimination may have taken place, or has the potential to take place, the complainant shall be so advised of this finding, in writing, and provided advisement again of his/her right to legal options to file complaints.

After investigation, the procedure provides for a panel which is comprised in part, of a constituency of each party to the complaint, who will make recommendations to the President. Training shall be provided for those who serve on the panel that will make recommendations to the President. Time frames shall not exceed 90 days for filing, processing and resolution of such matters, time frames which are consistent with the Regulations for Affirmative Action by State Government.

Page 42

1  A. I was not aware that you entered into an
2  agreement to keep your job for not testifying for
3  Helen Main.
4  Q. Were you aware that I agreed not to testify for
5  Helen Main?
6  A. I saw a document. That's how I was aware. But
7  other than that, I have no knowledge of what was going
8  on with you.
9  Q. You saw a document?
10  A. Uh-huh.
11  Q. When you saw that document, did you see anywhere
12  on the document that I agreed not to testify for
13  Helen Main?
14  A. I don't recall.
15  Q. What do you recall from reading that document?
16  A. I recall from reading the document it's something
17  I believe I saw with a complaint that was filed. That's
18  how I remember that document.
19  Q. I will -- I don't have that particular document
20  handy, but perhaps this afternoon I will have you look
21  at it to refresh your memory.
22  A. Okay.
23  Q. Would you agree that the language in this
24  affirmative action procedure --
25      MR. JORDANO: Exhibit 4?

Page 43

1      MR. CAYER: Exhibit 4.
2  BY MR. CAYER:
3  Q. Where it says that all employees shall be free
4  from all restraint, interference, coercion, or reprisal
5  on the part of their associates, supervisors, and all
6  others in making any complaint or appeal and serving as
7  a representative for a complainant, et cetera, and
8  appearing as a witness, et cetera, would you agree that
9  that language applies to all employees at
10  Western Connecticut State University?
11  A. Yes, I would.
12  Q. Including a confidential, professional employee?
13  A. I would say it applies to all employees.
14  Q. Every single employee?
15  A. All employees.
16  Q. Okay. Do you feel that if an affirmative action
17  officer had any role whatsoever in trying to restrain,
18  interfere, coerce, or exact reprisal against a person
19  who attempted to appear as a witness for another person
20  at CHRO, that that would be a very serious matter
21  indeed?
22      MR. JORDANO: Objection to the form,
23  foundation. Go ahead and answer if you understand it.
24  A. I feel that it would be a serious matter for
25  anyone.

Page [44]

1  BY MR. CAYER:
2  Q. Shouldn't an affirmative action officer be held
3  to a higher standard on that issue, Mrs. Barnwell?
4  A. I think that everyone should be held to a higher
5  standard for discrimination.
6  Q. Is it true that you have just lost another
7  secretary, Mrs. Barnwell?
8  A. My secretary just transferred.
9  Q. What was the -- what were the circumstances of
10  her being transferred?
11      MR. JORDANO: Can I inquire as to the
12  relevancy of her recent secretary and why that's
13  material to this case.
14      MR. CAYER: Establishing a pattern of her
15  treatment.
16      MR. JORDANO: How does that relate to your
17  claim that --
18      MR. CAYER: It's all connected.
19      MR. JORDANO: Wait a minute. How does
20  relate to your claim that you were retaliated against
21  because you complained about diversity in 2002?
22      MR. CAYER: It's all connected.
23      MR. JORDANO: Well, I'm having a hard time
24  as to how it's connected --
25      MR. CAYER: You'll see. When we get there

Page [45]

1  you'll see.
2      MR. JORDANO: All right. Go ahead. I'll
3  let this go a little bit, but I don't see how it's
4  connected at all to this claim.
5      This would be a secretary she lost in 2004
6  or five?
7      MR. CAYER: She lost in 2005, I believe.
8      MR. JORDANO: After you've left the
9  University?
10      MR. CAYER: Correct, right.
11      MR. JORDANO: Go ahead and answer if you
12  know. I'm sorry. Repeat the question.
13  BY MR. CAYER:
14  Q. What were the circumstances of -- this was
15  Ruth DeFranco?
16  A. That is correct.
17  Q. What were the circumstances of her leaving?
18  A. For changing for another position.
19  Q. All right. Was she unhappy working for you?
20  A. No, she was not.
21  Q. Is it true that she's the third Caucasian
22  secretary to leave your employ since you've been at
23  WestConn?
24  A. Yes, she is.
25  Q. And that each one of them were very unhappy

12 (Pages 42 to 45)

Cayer v. W. CT State

Spiridon  6/2/2005                                                       Charles Spiridon

Page 59

1   document.

2             (Plaintiff's Exhibit No. 4, Memo, was

3             marked for identification.)

4   Q   (By Mr. Cayer)  Are you familiar with this

5   document, Mr. Spiridon?

6             (Witness reviews document.)

7   A   I have seen it before, yes.

8   Q   (By Mr. Cayer)  Am I correct that this

9   document is sent out annually to all employees at the

10  university?

11  A   Yes, I believe that's correct.

12  Q   Was this also a handout at the diversity

13  training?

14  A   It may have been.  I don't recall if it was

15  or it wasn't.

16  Q   I would like you to look -- go down a few

17  pages to where it says, "Affirmative Action Grievance

18  Procedure," third paragraph.

19            (Witness reviews document.)

20  A   Yes.

21  Q   (By Mr. Cayer)  "Protection from adverse

22  actions.  All employees shall be free from all

23  restraint, interference, coercion or reprisal on the

24  part of their in associates, supervisors, and all

25  others in making any complaint or appeal in serving

Brandon Smith Reporting

Page 60

1   as a representative for a complaint, in appearing as

2   a witness or in seeking information."

3          MR. JORDANO:  Where are you reading from?

4   What page?

5          MR. CAYER:  The page -- I'm not sure

6   there's a number on it -- it starts, "Affirmative

7   Action Grievance Procedure," at the top and it's the

8   third paragraph.

9          MR. JORDANO:  I see it.  Okay.  Thank you.

10         What's the question?

11      Q   (By Mr. Cayer)  The question is:  Would you

12  agree that I am covered by this policy?

13      A   All employees are, yes.

14      Q   And that it would be improper to either

15  restrain me, interfere, coerce me or exact reprisal

16  against me for anything that I would do to assist an

17  employee in her discrimination complaint; is that

18  correct?

19      A   Yes, that's the protection the policy

20  provides.

21      Q   So when I announced that I would be

22  assisting Helen Main in her discrimination complaint,

23  as well as testifying for her, I was within my

24  rights; is that correct?

25         MR. JORDANO:  Object.  Calls for a legal

```
 1   worded differently or were they similar?
 2   A   I think they are similar.
 3   Q   Okay.  Would you agree that these policies
 4   -- and by the way attached is a later policy where
 5   Barbara Barnwell has done a mailing to all employees.
 6   A   The ones signed by Dr. Roach?
 7   Q   Yes.  If you see page 2, it has a cover memo
 8   from Barbara Barnwell to all employees and then
 9   attached is the affirmative action policy statement.
10   A   Yes.
11   Q   I would like to read to you the top paragraph
12   of the first document.
13            MR. JORDANO:  Objected.  The
14   document is in evidence.  Can you ask your question?
15            MR. CAYER:  I would like to read it,
16   sir, because you have read documents into the record
17   and I will do so as well.
18            MR. JORDANO:  All right, Mr. Cayer.
19   You're paying for the depo.  Go ahead.
20   BY MR. CAYER:
21   Q   "Protection from adverse actions.  All
22   employees shall be free from all restraint,
23   interference, coercion, or reprisal on the part of
24   their associates, supervisors and all others in making
25   any complaint or appeal in serving as a representative
```

Page 30

1  for complainant, in appearing as a witness or in
2  seeking information.
3       The above principles apply with equal force
4  after a complaint has been adjudicated. Should these
5  principals be violated, the facts shall be brought to
6  the attention of the Director of Affirmative Action,
7  Equity and Multicultural Affairs by the aggrieved
8  party, his or her representative or any person
9  effected.
10      The Director of Affirmative Action, Equity and
11 Multicultural Affairs shall bring all such situations
12 to the attention of the President and Dean of Human
13 Resources for confidential discussion, review, the
14 potential for early proactive intervention and
15 appropriate action."
16      Do you agree, Mr. Jakabauski, that is and was
17 the policy of Western Connecticut State University on
18 the principle of protection from adverse actions?
19    A   Yes.
20    Q   When it says in the first line "all employees,"
21 what does that mean, in your opinion, sir?
22    A   It means specifically what it says, all
23 employees.
24    Q   And that would include management, confidential
25 employees as well?

1   A
2   Q
3   hersel
4   defini
5   A
6   assume
7   Q
8   being
9   the pr
10  in her
11  A
12  Aware
13  Q
14  time t
15  had be
16  And th
17  being
18  A
19  Helen
20  Q
21  A
22  perfec
23  Q
24  A
25  Q

1    A    That's correct.

2    Q    And are you aware that Barbara Barnwell,

3    herself, has indicated that that is the correct

4    definition of that term "all employees"?

5    A    I'm not aware that she said that but I

6    assume she has, yes.

7    Q    Are you aware that I spoke out about Helen Main

8    being discriminated against, and that I announced to

9    the president that I would be submitting an affidavit

10   in her behalf at CHRO?

11   A    I'm not sure of the question.  Am I aware?

12   Aware in what sense?

13   Q    Let's put it this way:  Were you aware at the

14   time that you came to my house on October 27 that I

15   had been speaking out about the Helen Main matter?

16   And the fact that she was being discriminated against,

17   being treated unfairly, all the issues that --

18   A    I was aware that you were concerned about the

19   Helen Main issue, in quotes.

20   Q    Okay.

21   A    What the specifics of that case were, to be

22   perfectly honest with you, I wasn't paying attention.

23   Q    But we did talk about it at length?

24   A    We did talk about it.

25   Q    So why are you saying that you are not aware of